**David A. DRAEGERT, Plaintiff–Appellant,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant–Appellee.**

Docket No. 01–6185.

United States Court of Appeals, Second Circuit.

Argued: June 4, 2002.

Decided: Nov. 14, 2002.

Kenneth R. Hiller, Amherst, NY, for Plaintiff–Appellant.

Maria Fragassi Santangelo, Assistant Regional Counsel, New York, NY (Lisa de Soto, General Counsel, Washington, DC, Barbara L. Spivak, Chief Regional Counsel, New York, NY, on the brief) for Defendant–Appellee.

Before: KEARSE and McLAUGHLIN, Circuit Judges, and DANIELS, District Judge *.

KEARSE, Circuit Judge.

Plaintiff David Draegert appeals from a judgment of the United States District Court for the Western District of New York, Richard J. Arcara, *Judge,* dismissing his complaint seeking disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401–432 (1994). The district court granted the motion of defen-

---

* Honorable George B. Daniels, of the United States District Court for the Southern District of New York, sitting by designation.

dant Commissioner of Social Security ("Commissioner") for judgment on the pleadings, ruling that there was substantial evidence to support the Commissioner's denial of benefits on the ground that Draegert had transferable work skills acquired in his prior job, which enabled him to perform substantial gainful activity. On appeal, Draegert argues principally that the Commissioner did not meet her burden of proving that he possessed transferable "skills," within the meaning of the Social Security regulations, rather than merely certain abilities or aptitudes. For the reasons that follow, we agree that the Commissioner did not meet her burden. We therefore reverse and remand for the Commissioner to calculate Draegert's disability benefits.

## I. BACKGROUND

The fundamental facts are not in dispute. Draegert had a general equivalency high school diploma and had received vocational training as a security safety officer. From 1980 until 1995, he worked as a security safety officer at a mental health facility. His responsibilities there included patrolling the grounds, on foot and in a vehicle, in order to protect the residents from trespassers and other hazards, and maintaining fire safety by checking fire-fighting equipment. On occasion, he extinguished small fires and made criminal arrests for trespassing and disorderly conduct.

In March 1995, Draegert retired. He was 55 years of age and suffered from coronary artery disease, for which he had undergone surgery. In March 1996, he applied to the Social Security Administration ("SSA") for disability benefits. His application was denied initially and on reconsideration, following which a hearing was held before an SSA administrative law judge ("ALJ"). At the hearing, Draegert described the responsibilities he had had as a security safety officer at the mental health facility, which included those described above, as well as a certain amount of lifting that required medium exertion. He testified that as a result of his heart condition and a debilitating arthritic condition, *inter alia,* he could no longer perform the duties of that position.

As Draegert was a person "of advanced age ( [*i.e.,*] 55 or older)," 20 C.F.R. § 404.1568(d)(4) (2002), the ALJ called a vocational expert ("VE") to give an opinion not only as to whether Draegert could perform his old job but also as to the transferability of his work skills to new jobs. As the "skills [Draegert] acquire[d] from [his] past relevant work," Hearing Transcript ("Tr.") at 31, the VE listed the following:

> The ability to learn and apply rules and procedures, which are sometimes hard to understand. The ability to use reason and judgement in dealing with all kinds of people. The ability to think clearly and react quickly in an emergency. The ability to keep physically fit. And the ability to make conclusions based on facts and on one's personal judgment....
>
> . . . .
>
> .... [And] the ability to change easily and frequently from one activity to another.

Tr. 31, 37.

The ALJ asked the VE to assume that Draegert had the residual functional capacity either for sedentary work or for light work except that involving frequent climbing, balancing, stooping, kneeling, crouching, or crawling, *see* Tr. 34, and to opine (a) whether there were any jobs in the economy that Draegert could do, and (b) "whether the ... skills that [Draegert] acquired in his past relevant work are ....

transferable to" the jobs identified by the VE, Tr. 31. The VE identified two such semi-skilled jobs, to wit, gate guard, a light-exertion position, and dispatcher, a sedentary position. For each of those positions, the VE testified that Draegert would require one-to-three months of training.

In a Decision dated December 7, 1997 ("ALJ Decision"), the ALJ ruled that Draegert was not entitled to disability benefits. The ALJ found that "the medical evidence establishes the existence of severe impairments, to wit, status post bypass surgery, arthritis in his left hip, coronary artery disease, and hypertension," ALJ Decision at 2, and that "[b]ecause of the job's prolonged standing and walking, the claimant is unable to perform his past relevant work, as it exceeds his residual functional capacity," ALJ Decision at 7. *See also id.* at 8, ¶ 8 (Draegert "cannot perform his past relevant work as a security safety officer").

However, the ALJ found that the record did not support Draegert's position that those impairments "prevented him from engaging in substantial gainful activity." *Id.* at 5. Relying on the VE's "testi[mony] that there were jobs within the claimant's maximum residual functio[na]l capacity to which the claimant's acquired work skills could be transferred with very little adjustment," the ALJ concluded that Draegert had "transferable skills and the residual functional capacity for light work," *id.* at 7, although he was "limited [in his] ability to climb, balance, stoop, kneel, crouch and crawl," *id.* at 6. The ALJ found that

> [t]he claimant has acquired work skills that are transferable to the semiskilled work functions of other work. . . .
>
> 12. Although the claimant's additional nonexertional postural limitations and his ability to do prolonged walking or continuous standing may not allow him to perform the full range of light work, using Vocational Rule 202.07 as a framework for decisionmaking, there are nonetheless a significant number of jobs in the national economy and in the [*sic*] western New York which he could perform, using skills acquired from his past relevant work. Examples of such jobs are: gate guard, there being 950,000 such jobs in the national economy, and 5,600 in the region and dispatcher, there being 1.2 million such jobs in the national economy, and 790 such jobs in the western New York region.
>
> 13. Considering the claimant's residual functional capacity for light work, his age, education, and work experience within the framework of Section 404.1569 of Regulations No. 4 and Rule 202.07, Table No. 2, of Appendix 2, Subpart P, Regulations No.4, the undersigned finds that the claimant is not disabled.

ALJ Decision at 8–9, ¶¶ 11–13. The ALJ concluded that Draegert "was not under a 'disability,' as defined in the Social Security Act, at any time through the date of this decision," *id.* at 9, ¶ 14, and denied his claim for benefits. The SSA Appeals Counsel denied review.

Draegert commenced the present action in the district court seeking review of the denial of benefits, contending principally that the Commissioner erred in considering the "abilit[ies]" identified by the VE as vocational "skills." The parties stipulated that, from an exertional standpoint, Draegert retained the residual functional capacity to perform the full range of either light or sedentary work, except for his inability to walk for prolonged periods, to stand continuously, or to climb, balance, stoop, kneel, crouch, and crawl; they conceded that the only issue was whether the Commissioner had properly found that Drae-

gert possessed transferable skills that enabled him to perform other substantial gainful activity existing in the national economy. Each side moved for judgment on the pleadings; the motions were referred to Magistrate Judge Leslie G. Foschio for report and recommendation.

In a Report and Recommendation dated March 20, 2001 ("Magistrate's Report" or "Report"), the magistrate judge recommended that the district court grant the motion of the Commissioner and deny that of Draegert. The Report stated that

> Draegert's skills identified by the Vocational Expert include the abilities to (1) learn and apply rules and procedures which are sometimes hard to understand; (2) use reason and judgment in dealing with all kinds of people, (3) think clearly and react quickly in an emergency; (4) keep physically fit; and (5) make conclusions based on facts and on one's personal judgment. The regulations do not define the terms "skills," "abilities," "aptitudes" or "traits." However, some guidance is provided in Social Security Ruling 82–41 . . ., which defines a "skill" as
>
>> knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level (requires more than 30 days to learn). It is practical and familiar knowledge of the principles and processes of an art, science or trade, combined with the ability to apply them in practice in proper and approved manner. This includes activities like making precise measurements, reading blueprints, and setting up and operating complex machinery. A skill gives a person a special advan-

> tage over unskilled workers in the labor market.

Magistrate's Report at 16–17 (footnote omitted). Stating further that "what may otherwise be considered as abilities or aptitudes may constitute skills if they are enhanced by specific work experience," *id.* at 17 (internal quotation marks omitted), the magistrate judge stated that

> Draegert's "abilities" . . . are neither so vague, nor vocationally insignificant that they are merely traits. Rather, Draegert's abilities are described in such a way as to indicate that they have been enhanced by his experience as a security safety officer. For example, in Draegert's past work, he patrolled the grounds of a psychiatric center to ensure the safety of the residents. In that job, Draegert had arrested people for trespassing and for disorderly conduct, indicating that Draegert had successfully dealt with people who posed a threat to others. Draegert also occasionally had to break up altercations between residents, demonstrating that Draegert had acquired the ability to subdue mental health patients. Draegert was also responsible for maintaining fire safety equipment and had participated in extinguishing several fires in his previous job. Although many people in the general population may possess certain traits rendering the[m] better suited for a job as a security safety officer at a mental health facility, such as patience with those who are mentally disabled, and level-headedness in situations involving danger, the court finds that such traits would require enhancement before an individual would be allowed to work in such a position, and that such traits would be further enhanced after working as a security safety officer for fifteen years as Draegert did. That Draegert received specific training before he was

allowed to work as a security safety officer further supports this finding.

On this record, the court finds the ALJ did not err in considering Draegert's "abilities" identified by the vocational expert as "skills."

Magistrate's Report at 17–18.

In an order dated June 11, 2001, the district court, over Draegert's objections, adopted the Report's proposed findings and recommendations and granted judgment in favor of the Commissioner. This appeal followed.

## II. DISCUSSION

On appeal, Draegert contends principally that, because he was a person of advanced age, once it was determined (a) that he was no longer employed, (b) that he suffered from severe impairments that had lasted more than one year, and (c) that he was no longer capable of performing his prior work, he was entitled to an award of disability benefits because the Commissioner failed to carry her burden of proving that he had vocational skills that were transferable to other jobs. For the reasons that follow, we agree.

Title II of the Social Security Act (the "Act") provides that the term "disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). For purposes of this provision, an individual may be determined to be "under a disability only if his ... impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

SSA regulations establish a five-step process by which the Commissioner is required to evaluate a claim for disability benefits. *See, e.g., Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Bush v. Shalala,* 94 F.3d 40, 44–45 (2d Cir.1996); 20 C.F.R. § 404.1520 (2002). In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a "severe impairment," (3) that the impairment is not one that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do. *See id.* §§ 404.1520(b)-(f); *id.* Part 404, Subpt. P, App. 2. Although the claimant bears the general burden of proving that he is disabled under the statute, "if the claimant shows that his impairment renders him unable to perform his past work, the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform." *Carroll v. Secretary of Health and Human Services,* 705 F.2d 638, 642 (2d Cir.1983).

In order to take into account the effect of a claimant's age and work experience on his ability to engage in any other kind of substantial gainful work, SSA regulations provide that

[i]f you are of advanced age (age 55 or older), and you have a severe impairment(s) that limits you to *sedentary* or *light work,* we will find that you cannot make an adjustment to other work unless you have skills that you can transfer to other skilled or semiskilled work ... that you can do despite your impairment(s). We will decide if you have transferable skills as follows.... If you are of advanced age but have not at-

tained age 60, and you have a severe impairment(s) that limits you to no more than *light* work, we will apply the rules in paragraphs (d)(1) through (d)(3) of this section to decide if you have skills that are transferable to skilled or semi-skilled light work (see § 404.1567(b)).

20 C.F.R. § 404.1568(d)(4) (emphases in original). The SSA's table of medical-vocational guidelines ("Grid Rules") requires that a claimant of advanced age who is at least a high school graduate, who previously held a skilled or semi-skilled job that he can no longer perform but who has the residual functional capacity to perform light work, is not to be found disabled if he has job skills that are transferable but must be found disabled if he does not. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rules 202.07, 202.06.

The "paragraphs (d)(1) through (d)(3)" rules referred to in § 404.1568(d)(4) describe transferability as follows:

(1) *What we mean by transferable skills.* We consider you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work. This depends largely on the similarity of occupationally significant work activities among different jobs.

(2) *How we determine skills that can be transferred to other jobs.* Transferability is most probable and meaningful among jobs in which—

(i) The same or a lesser degree of skill is required;

(ii) The same or similar tools and machines are used; and

(iii) The same or similar raw materials, products, processes, or services are involved.

(3) *Degrees of transferability.* There are degrees of transferability of skills ranging from very close similarities to remote and incidental similarities among jobs. A complete similarity of all three factors is not necessary for transferability. However, when skills are so specialized or have been acquired in such an isolated vocational setting (like many jobs in mining, agriculture, or fishing) that they are not readily usable in other industries, jobs, and work settings, we consider that they are not transferable.

20 C.F.R. §§ 404.1568(d)(1)-(3). Although the term "skill[ ]" is not defined in these regulations, it is elucidated in an SSA Ruling that is designed to "explain the concepts of 'skills' and 'transferability of skills' and to clarify how these concepts are used in disability evaluation," SSR 82–41, *Work Skills and Their Transferability as Intended by the Expanded Vocational Factors Regulations* ("SSR 82–41" or "SS Ruling"), 1982 WL 31389, at *1 (S.S.A. Feb. 26, 1979). SSR 82–41, states in part, as follows:

*Skills and their transferability relate to "work experience" in the definition of disability and to people's abilities to do occupations different from those they did before becoming impaired. . . .*

. . . .

a. What a "skill" is. *A skill is knowledge of a work activity* which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties *and is acquired through performance of an occupation* which is above the unskilled level (requires more than 30 days to learn). It is practical and familiar knowledge of the principles and processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner. This includes activities like making precise measure-

ments, reading blueprints, and setting up and operating complex machinery. A skill gives a person a special advantage over unskilled workers in the labor market.

Skills are not gained by doing unskilled jobs, and a person has no special advantage if he or she is skilled or semiskilled but can qualify only for an unskilled job because his or her skills cannot be used to any significant degree in other jobs. . . . A person's acquired work skills may or may not be commensurate with his or her formal educational attainment.

b. What "transferability" is. Transferability means applying work skills which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semiskilled jobs. Transferability is distinct from the usage of skills recently learned in school which may serve as a basis for direct entry into skilled work (Appendix 2, section 201.00(g)).

. . . .

*The regulations definition of semiskilled work* in regulations sections 404.1568(b) and 416.968(b) *states that semiskilled jobs "may require alertness and close attention . . . coordination and dexterity . . . as when hands or feet must be moved quickly to do repetitive tasks." These descriptive terms are not intended, however, to illustrate types of skills, in and of themselves. The terms describe worker traits (aptitudes or abilities) rather than acquired work skills. Skills refer to experience and demonstrated proficiency with work activities in particular tasks or jobs. In evaluating the skill level of [prior relevant work] or potential occupations, work activities are the determining factors.* Worker traits to be relevant must have been used in connection with a work

activity. Thus, in the regulations, the trait of alertness is connected with the work activities of close attention to watching machine processes, inspecting, testing, tending or guarding; and the traits of coordination and dexterity with the use of hands or feet for the rapid performance of repetitive work tasks. *It is the acquired capacity to perform the work activities with facility (rather than the traits themselves) that gives rise to potentially transferable skills.*

SSR 82–41 at **1–3 (emphases added). The SS Ruling goes on to require that "[w]hen a finding is made that a claimant has transferable skills, the acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the . . . ALJ's decision." *Id.* at *7.

This Court has not previously addressed the differences, for purposes of determining disability under the Act, between vocational "skills" and general "traits," "aptitudes," or "abilities." We agree, however, with the other Circuits that have concluded that there is an inherent difference between aptitudes and skills. *See, e.g., Renner v. Heckler,* 786 F.2d 1421, 1424 (9th Cir.1986) (per curiam); *Ellington v. Secretary of Health and Human Services,* 738 F.2d 159, 161 (6th Cir.1984) ("*Ellington* "); *Weaver v. Secretary of Health and Human Services,* 722 F.2d 310, 311–12 (6th Cir.1983) ("*Weaver* ").

In *Weaver,* the VE had opined that the claimant, a mechanic whose work on box-making machines involved using cutting torches, welders, pipe-threading machines, grinders, drills and drill presses, saws, wrenches, screw drivers, hammers, chain falls, hydraulic jacks, and lifting machines, had skills that were transferable to such jobs as inspection, bench assembly and repair, and processing. But the "skills" identified by the VE were simply Weaver's

" 'average intelligence, high average space relations, average form relations, above average finger dexterity, and manual dexterity in terms of the tools he used.' " 722 F.2d at 311 (quoting administrative transcript). The court found that "the vocational expert [had] dealt with Weaver's 'aptitudes' rather than with Weaver's 'skills.' " *Id.* at 312. It stated that

> [a]n "aptitude" is an "inclination, a natural ability, talent, or capacity for learning." A "skill" is a "learned power for doing something competently." *Webster's Ninth New Collegiate Dictionary.* In short, an aptitude is an innate ability while a skill is a learned ability.... While a person may have natural talents including dexterity, general coordination, space relations, etc., that same person may not have the particular learned ability to do a specific job.

722 F.2d at 311–12. The *Weaver* court noted that certain Grid Rules presume a person to be disabled if he is of advanced age, has severe medical impairments precluding his return to his prior work, and has limited or no education, unless he has "a particularly transferable skill, or 'vocational asset.' " 722 F.2d at 312. The rationale for that presumption is that a person of advanced age has little time to learn a new skill and apply it to a new job, especially if his ability to work has been limited by a medical disability. The court reasoned that the "presumption would be effectively negated if such basic aptitudes as the ability to see, think and use[ ] one[']s ... hands, common to most persons, are considered transferable skills." *Id.* (internal quotation marks omitted). Accordingly, the *Weaver* court reversed the determination of no-disability and remanded for calculation of benefits.

In *Ellington,* the court similarly reversed a determination of no-disability and remanded for calculation of benefits where

the "skills" found by the ALJ and the district court consisted of capacity to exercise "independent judgment," 738 F.2d at 159, "utilization of tools," *id.* at 160, and "responsibility for a work product," *id.* The court of appeals stated that

> The question in the instant case is whether the capacity to exercise "independent judgment" constitutes a "transferrable skill" within the meaning of the grid. We conclude that the phrase "transferable skill" requires more than mere "judgment"....

*Id.* at 159–60. The court pointed out that 20 C.F.R. § 404.1565(a) (1983) defines work experience as "skills and abilities you have *acquired* through work which show the type of work you may be expected to do." (emphasis added).

That "transferable skills," as the term is used in the grid, must be particular acquired characteristics is further demonstrated by Rules 201.05 and 201.08. These rules direct that claimants who have not had a work history imparting transferable skills but have benefited from particular vocational education "provid[ing] for direct entry into skilled work" are considered to be not disabled. Thus transferable skills for the purposes of the grid are made equivalent to education. Such skills refer to learned abilities which combine knowledge with coordinated physical movements, such as operating a typewriter, or a learned mental discipline, or an area of expertise.

"Independence of judgment" and "responsibility for a work product" are too vague to constitute particular skills which are transferable. If "independence of judgment" and "responsibility for a work product" are to be considered skills independent of any particular tasks a claimant can perform, there is then no basis for distinguishing claim-

ant's skills from those of a lawyer, a secretary or a nuclear physicist.

738 F.2d at 160–61.

This analysis is entirely supported by the regulatory provisions, for the clarification furnished by SSR 82–41 explains that "[s]kills and their transferability relate to 'work experience,'" and that "[a] skill is knowledge of a work activity ... and is acquired through performance of an occupation," SSR 82–41, at *1. Accordingly, SSR 82–41 repeatedly refers to "acquired work skills," *see, e.g., id.* at *2, *3, *5, *7, and to the occupational means by which "skill[s]" may be "acquired," *see, e.g., id.* at *1, *2, *3, *5, *6. The SS Ruling makes clear that regulatory references to general abilities such as

> *"alertness and close attention ... coordination and dexterity ...* as when hands or feet must be moved quickly to do repetitive tasks[ ]" ... *are not intended ... to illustrate types of skills,* in and of themselves. *The terms describe worker traits (aptitudes or abilities) rather than acquired work skills.* Skills refer to experience and demonstrated proficiency with work activities in *particular tasks* or jobs. In evaluating the skill level of [prior relevant work] or potential occupations, work activities are the determining factors.

*Id.* at *3 (emphases added).

Within this framework, the administrative record lacks substantial evidence to support the Commissioner's determination that Draegert is not disabled because he had transferable skills. The only so-called "skills" mentioned by the VE were Draegert's (1) "ability to learn and apply rules and procedures, which are sometimes hard to understand," Tr. 31; (2) "ability to use reason and judgement in dealing with all kinds of people," *id.;* (3) "ability to think clearly and react quickly in an emergency," *id.;* (4) "ability to keep physically fit,"

*id.;* (5) "ability to make conclusions based on facts and on one's personal judgment," *id.;* and his (6) "ability to change easily and frequently from one activity to another," Tr. 37. These abilities, when not linked to any particular tasks, are merely *traits or aptitudes, not job skills,* for "[w]orker traits[,] to be relevant[,] must have been used in connection with a work activity," SSR 82–41, at *3; and neither the VE, nor the ALJ, who relied on the VE's testimony in finding that Draegert had transferable "skills," gave any explanation as to how these abilities and aptitudes had been used in connection with Draegert's prior work or had been refined by occupational experience into an acquired work skill.

The district court made efforts to link some of these generalized abilities to "particular tasks," SSR 82–41, at *3, in Draegert's job as security officer at the mental health facility, stating principally that Draegert's abilities had been refined into job skills because "in [his] past work, he patrolled the grounds of a psychiatric center to ensure the safety of the residents," that he "had arrested people for trespassing and for disorderly conduct," that he had "br[oken] up altercations between residents," and that he "had acquired the ability to subdue mental health patients," Magistrate's Report at 17. These efforts, however, fell well short of providing any indication that, as enhanced by his prior work, those abilities were transferable to the only specific jobs that the ALJ found Draegert had the residual functional capacity to perform, to wit, gate guard and dispatcher.

For example, there is no suggestion in the record that the jobs of gate guard and dispatcher involve any patrolling. Moreover, to the extent that those jobs might involve patrolling on foot, a finding of transferability would not be supportable

because "in determining transferability," the ALJ must consider "[a]ll functional limitations included in the [residual functional capacity]," SSR 82–41, at *5, and the ALJ found that in light of Draegert's severe impairments, his residual functional capacity did not include "prolonged ... walking," ALJ Decision at 7. A skill that can no longer be used cannot be considered a skill that is transferable to a new job.

Nor is there any indication in the record that breaking up fights, subduing mental health patients, or making arrests for such behavior as disorderly conduct are among the responsibilities of gate guards or dispatchers. And if they were, the record reveals that Draegert's residual functional capacity would not encompass the ability to take such action, given the ALJ's findings as to his severe heart condition and arthritis, and his limited ability to stoop, crouch, or balance.

Similarly, although the magistrate judge also stated that Draegert had been "responsible for maintaining fire safety equipment," Magistrate's Report at 17, there is no indication in the record that maintenance of such equipment is any part of the job of gate guard or dispatcher. And although the magistrate judge found that Draegert had participated in extinguishing several fires, and we agree that the fact that a claimant would be able to extinguish an occasional small fire could come in handy (in any job), we cannot agree that that simple ability constitutes substantial evidence that he could be a gate guard or dispatcher.

In sum, the record in the present case does not permit the conclusion that the Commissioner carried her burden of showing that Draegert possessed vocational skills that were transferable to other work in the economy. Accordingly, Grid Rule 202.06, 20 C.F.R. Pt. 404, Subpt. P, App. 2, requires a finding that Draegert was under a disability within the meaning of the Act.

## CONCLUSION

We have considered all of the Commissioner's arguments on this appeal and have found them to be without merit. The judgment of the district court is reversed, and the matter is remanded for entry of a judgment remanding to the Commissioner for the calculation of disability benefits to be paid to Draegert.